**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

No. 07-377C (Bid Protest)
(Judge Firestone)

---

MOORE'S CAFETERIA SERVICES,
d/b/a MCS Management

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Telephone: (202) 616-2228
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

LTC FRANK MARCH
CAPT JOSHUA DREWITZ
Contract & Fiscal Law Division
Office of the Judge Advocate General
Department of the Army
901 N. Stuart Street, Suite 500
Arlington, VA 22203

June 28, 2007

# TABLE OF CONTENTS

**PAGE(S)**


STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE ..... 2

STATEMENT OF FACTS ..... 2

I. The Joint Report To Congress ..... 2

II. The Procurement History ..... 4

ARGUMENT ..... 8

I. Jurisdiction And The Standard Of Review ..... 8

II. The Government Is Entitled To Judgment Upon The Administrative Record Because The CO Properly Applied The Priority Required By The RSA ..... 10

A. The Five Percent Benchmark To Determine Whether A SLA's Offer Is "Fair And Reasonable" Outlined In The Joint Report Does Not Carry The Force Of Law ..... 11

III. The CO's Price Reasonableness Determination Was Rational And In Accordance With Regulation ..... 16

A. The CO Rationally Concluded The SLA's Price Was Fair By Comparing It To The Other Offerors' Proposals ..... 18

B. The CO Also Properly Compared The SLA's Price To The Independent Government Estimate In Determining Whether The Price Was "Fair And Reasonable" ..... 19

C. Even If The IGE Was Inaccurate, There Was No Prejudice To MCS Because All Bidders Used The Same Assumptions ..... 22

D. Even Assuming An Inaccurate IGE, Any Error Was Harmless Because The CO Also Compared The SLA's Proposed Price To Other Offerors' Proposed Prices ..... 23

IV. MCS Is Entitled To Injunctive Relief ..... 24

A. MCS Has Failed To Demonstrate, Through Clear and Convincing Evidence, That It Will Suffer Irreparable Harm If This Court Does Not Grant Its Motion For Injunctive Relief ..... 25

B. MCS Has Not Demonstrated, Through Clear And Convincing Evidence, That The Harm To The Government From Granting Injunctive Relief Would Be Less That The Harm To MCS If The Court Denied MCS's Motion ..... 26

C. MCS Has Not Demonstrated, Through Clear And Convincing Evidence, That It Is In The Public Interest To Grant MCS's Motion For Injunctive Relief ..... 27

CONCLUSION ..... 27

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

AINS, Inc. v. United States,
365 F.3d 1333 (Fed. Cir.2004) ..... 13

Am. Portland Cement Alliance v. EPA,
101 F.3d 772 (D.C. Cir.1996) ..... 13

Amoco Prod. Co. v. Village of Gambell, Alaska,
480 U.S. 531 (1987) ..... 25

Andersen Consulting v. United States,
959 F.2d 929 (Fed. Cir. 1992) ..... 22

Automated Comm. Sys., Inc. v. United States,
49 Fed. Cl. 570 (2001) ..... 24

Baird Corp. v. United States,
1 Cl. Ct. 662 (1983) ..... 25

Bannum, Inc. v. United States,
404 F.3d 1346 (Fed. Cir. 2005) ..... 8, 27

Bean Dredging Corp. v. United States,
22 Cl. Ct. 519 (1991) ..... 24

Blackfeet Nat'l Bank v. Rubin,
890 F. Supp. 48 (D.D.C. 1995) ..... 14

Blue & Gold Fleet, LP v. United States,
70 Fed. Cl. 487 (2006) ..... 9, 25

Cincom Systems, Inc. v. United States,
37 Fed. Cl. 663 (1997) ..... passim

Citizens to Preserve Overton Park,
401 U.S. at 415 ..... 8

Commonwealth of Kentucky Educ. Cabinet v. United States,
424 F.3d 1222 (Fed. Cir. 2005) ..... 11

Dismas Charities, Inc. v. United States,
61 Fed. Cl. 191 (2004) .......... 23

Federal Mgmt Sys., Inc. v. U.S.,
61 Fed. Cl. 364 (2004) .......... 13

First Enterprise v. United States,
61 Fed. Cl. 109 (2004) .......... 18

Galen Med. Assocs., Inc. v. United States,
369 F.3d 1324 (Fed. Cir. 2004) .......... 10

Honeywell, Inc. v. United States,
870 F.2d 644 (Fed. Cir. 1989) .......... 24

Hospital Klean of Texas, Inc. v. United States,
65 Fed. Cl. 618 (2005) .......... 26

IMS Svcs. Inc. v. United States,
33 Fed. Cl. 167 (1995) .......... 25, 26

Impresa Construzioni Geom. Domenico Garufi v. United States,
238 F.3d 1324 (Fed. Cir. 2001) .......... 8, 9

Interspiro, Inc. v. United States,
72 Fed. Cl. 672 (2006) .......... 8

JWK Int'l Corp. v. United States,
52 Fed. Cl. 650 (2002) .......... 22

Keco Indus., Inc. v. United States,
203 Ct. Cl. 566 (1974) .......... 9

Kennecott Utah Copper Corp. v. United States Dep't of Interior,
88 F.3d 1191 (D.C. Cir.1996) .......... 13

Kinetic Structures Corp. v. United States,
6 Cl. Ct. 387 (1984) .......... 19, 26

LeCroy Research Sys. Corp. v. United States,
751 F.2d 123 (2d. Cir. 1984) .......... 14

Lermer Germany GmbH v. Lermer Corp.,
94 F.3d 1575 (Fed. Cir. 1996) .......... 24

Mantech Telecomm. and Info. Sys. Corp. v. United States,
49 Fed. Cl. 57 (2001) ........................................................................................ 15

M.W. Kellogg Co. v. United States,
10 Cl. Ct. 17 (1986) ........................................................................................ 9

NISH v. Cohen,
247 F.3d 197 (4th Cir. 2001) ........................................................................... 3

Matter of NVT Technologies, Inc.,
Comp. Gen. B-256072.2, 94-1 CPD 297 ............................................................ 22

National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd.,
357 F.3d 1319 (Fed. Cir. 2004) ......................................................................... 24

PGBA, LLC v. United States,
389 F.3d 1219 (Fed. Cir.2004) .......................................................................... 25

Portfolio Disposition Mgmt Group, LLC v. United States,
64 Fed. Cl. 1 (2005) ..................................................................................... 9, 23

R & W Flammann GmbH v. United States,
339 F.3d 1320 (Fed. Cir. 2003) ......................................................................... 9

Matter of Rodgers Travel, Inc.,
Comp. Gen. No. B-291785, 2003 CPD 3 (Mar.12, 2003) .............................................. 18

Ryan Co. v. United States,
43 Fed. Cl. 646 (1999) ....................................................................................... 22

Seattle Security Svcs. v. United States,
45 Fed. Cl. 560 (2000) ....................................................................................... 27

SDS Int'l v. United States,
48 Fed. Cl. 742 (2001) ...................................................................................... 17

Sierra Mil. Health Servs. v. United States,
58 Fed. Cl. 573 (2003) ................................................................................. 26, 27

Southfork Sys., Inc. v. United States,
141 F.3d 1124 (Fed. Cir. 1998) .................................................................... 10, 24

Tech Systems, Inc. v. United States,
50 Fed. Cl. 216 (2001) ........................................................................................ 8

Telecomms. Research & Action Ctr. v. FCC,
800 F.2d 1181 (D.C. Cir.1986) .......... 13

United International Investigative Svcs., Inc. v United States,
41 Fed. Cl. 312 (1998) .......... 25

Yocum v. United States,
66 Fed. Cl. 579 (Fed. Cl. 2005) .......... 14

**STATUTES AND PUBLIC LAWS**

5 U.S.C. § 706 .......... 8

20 U.S.C. § 107 .......... 2,3, 10

28 U.S.C. § 1491(b) .......... 2, 7, 25

41 U.S.C. § 48 .......... 3

Pub. L. 109-163 .......... 3, 12, 15

Pub. L. 109-364 § 856 .......... 14

Pub. L. 848(b) .......... 15

**REGULATIONS**

4 C.F.R. § 21.2(a)(1) .......... 7

34 C.F.R. § 395.33(a) .......... 10

48 C.F.R. § 15.305(a)(1) .......... 18

48 C.F.R. § 15.404-1(b)(2) .......... 17

48 C.F.R. § 15.404-1(b)(i) .......... 18

48 C.F.R. § 15.404-1(b)(v) .......... 19

48 C.F.R. § 15.404-1(d)(3) .......... passim

48 C.F.R. § 15.404-1(a)(1) .......... 16

## MISCELLANEOUS

71 Fed. Reg. 5819 (Feb. 3, 2006) .......................................................................................... 12

John Cibinic, Jr. & Ralph C. Nash, Jr., Formation of Gov't Contracts, 1317 (3d ed. 1998) ...... 21

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS
BID PROTEST

| | | |
|---|---|---|
| MOORE'S CAFETERIA SERVICES, d/b/a MCS Management | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 07-377C (Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF**

Pursuant to Rule 52.1(b) of the Rules of the Court of Federal Claims, defendant United States respectfully requests that the Court enter judgment upon the administrative record in favor of the United States and deny plaintiff Moore's Cafeteria Services's ("MCS") request for injunctive relief. In support of this motion, we rely upon the following memorandum of law and the administrative record ("AR"). As demonstrated below, the United States is entitled to judgment upon the administrative record, and for this reason, MCS is not entitled to any relief.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether the agency's determination that the state licensing agency ("SLA") for blind vendors proposed a "fair and reasonable price" was arbitrary, capricious, or contrary to law.

2. Whether the contracting officer's reliance on the agency's Independent Government Estimate was arbitrary, capricious, or contrary to law.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

3. Whether, assuming it succeeds on the merits, MCS has demonstrated, through clear and convincing evidence, that it is entitled to injunctive relief.

## STATEMENT OF THE CASE

This is a bid protest brought pursuant to the Court's bid protest jurisdictional statute, 28 U.S.C. § 1491(b). MCS challenges the Department of the Army's ("Army" or "agency") award of a food attendant services contract to the Kentucky Office for the Blind, the SLA for the State of Kentucky, which gives preference to blind persons when issuing a license for the operation of a vending facility. MCS argues that the agency contravened a Department of Defense policy statement outlined in a Joint Report submitted to Congress, but which has not yet been promulgated into binding regulation. Finally, MCS protests the agency's reliance on its Independent Government Estimate of the anticipated cost to perform the services contract. Following an unfavorable decision at the Government Accountability Office, MCS filed suit on June 15, 2007. MCS seeks an injunction preventing performance of the contract by the SLA, as well as costs and attorneys fees. Compl. at 25.

## STATEMENT OF FACTS

### I. The Joint Report To Congress

The Randolph-Sheppard Act ("RSA") states that, "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property." 20 U.S.C. § 107(a). The RSA further provides that, in the

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

award of contracts for vending facilities, priority shall be granted to "blind persons licensed by a State agency." 20 U.S.C. § 107(b).

In August of 2006, the Department of Defense ("DoD"), the Department of Education ("DOE") and the Committee for Purchase from People Who Are Blind Or Severely Disabled submitted a Joint Report to Congress. AR278-282. This report was required by section 848 of the National Defense Authorization Act of Fiscal Year 2006, Pub. L. 109-163. That law required the three parties to submit a joint statement of policy regarding application of the Javits-Wagner-O'Day ("JWOD") Act, 41 U.S.C. § 48 et seq.[1] and the Randolph-Sheppard Act (RSA), 20 U.S.C. § 107 et seq.

In this report, the three parties affirmed their commitment to those two Acts. The parties also outlined a "method of affording the Randolph-Sheppard 'priority'" in military dining procurements. AR280. The parties outlined the following method:

> Contracting officers shall afford State licensing agencies a priority under [RSA] when (1) the State licensing agency has demonstrated that it can provide such operation at a fair and reasonable price, with food of high quality comparable to that available from other providers of cafeteria services and comparable to the quality and price of food currently provided to military members; and (2) the State licensing agency's final proposal revision, or initial proposal if award is made without discussions, is among the highly ranked final proposal revisions with a reasonable chance of being selected for award. . . .

[1] The Javits Wagner O'Day Act ("JWOD") was enacted in 1971 to "provide training and employment opportunities for persons who are blind or have severe disabilities." NISH v. Cohen, 247 F.3d 197, 201 (4th Cir. 2001). Although both the JWOD and the RSA serve as preferences for the blind, the JWOD focuses on providing the blind and disabled with a "sheltered environment" to work, whereas the RSA extends to managerial opportunities. Id.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

The Report further proposed that the term "fair and reasonable price"

> means that the State licensing agency's final revision does not exceed the offer that represents the best value (as determined by the contracting officer after applying its source selection criteria contained in the solicitation) by more than five percent of that offer, or one million dollars, whichever is less, over all performance periods required by the solicitation."

AR280 (emphasis added). The Joint Report concluded by noting that "the parties will promptly implement complementary regulations reflecting the joint policy herein." AR280. To date, no regulations have been implemented with respect to the "five percent" criteria for determining price reasonableness.

II. The Procurement History

On January 23, 2007, the Army Contracting Agency, Southern Region, Fort Knox Directorate of Contracting, a component of the Army, issued solicitation number W9124D-07-R-0012. AR12-47. The request for proposals ("RFP") contemplated a one year, fixed price contract to provide food hall attendant and food preparation services at twelve different mess halls at Ft. Campbell, KY. AR334. The procurement was set aside for Historically Underutilized Business Zone ("HUBZone") small businesses, but also permitted submissions of offers from licensed SLAs in accordance with the RSA. AR12; 44.

Under the section entitled "Basis for Award," the original RFP stated that "a technically acceptable offer from a qualified State Licensing Agency will receive preference in accordance with the Joint Report to Congress, dated August 29, 2006." AR44. On January 29, 2007, the SLA for the state of Tennessee contacted Deborah Ault, the contracting officer ("CO"), inquiring

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

about the percentage requirement identified in the RFP. AR48. Specifically, the SLA's representative noted that "to the best of my knowledge there is no directive to convert [the Joint Report] into law." AR48.

After "consideration of this inquiry and further research," AR2, on February 7, 2007, the CO revised the solicitation to amend the award criteria. AR49-86. Specifically, Amendment 0001 removed language referring to the preference policy in the Joint Report and replaced it with the following language under Basis for Award:

> This solicitation is subject to exercise of the preference policy regarding qualified State Licensing Agencies for the Blind in accordance with the Randolph-Sheppard Act. A technically acceptable offer from a qualified State Licensing Agency will receive preference in accordance with the Randolph-Sheppard Act. . . .This merely serves as notice that preference will be applied should a technically acceptable offer be received from a qualified State Licensing Agency.

AR83-84. The amendment also extended the due date for offers until February 21, 2007. AR49. MCS did not challenge the provisions of the RFP.

Award was to be made on a lowest-price, technically acceptable award criteria, with RSA preference being afforded. AR84. The CO received five proposals, of which [redacted] were found technically accceptable. AR220. The offerors with the two lowest prices were MCS and the Kentucky Office for the Blind, the SLA for the Commonwealth of Kentucky ("KOB"). AR220.

The CO documented her source selection plan. AR197-199. Specifically, the offerors would be rated on past performance and experience and that "the government [would] award a contract to the lowest priced technically acceptable offeror after consideration of the preference

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

policy regarding qualified State Licensing Agencies for the Blind in accordance with the [RSA]. Application of this preference may result in award to other than the lowest price technically acceptable offeror." AR199. This source selection criteria was consistent with the "basis for award" identified in the amended solicitation. AR84. No one challenged these provisions.

The CO evaluated the past performance for both KOB and MCS as [redacted] AR200;212. The CO also found both offerors technically acceptable. AR200;212. Because the proposal of the Kentucky SLA was found to be technically acceptable, AR200, the contracting officer evaluated its offer for price reasonableness. AR219. The CO concluded in her source selection determination that "the price proposed by the Kentucky Office for the Blind is considered reasonable based on [redacted]." AR220. Specifically, the CO concluded that "the awardee's proposed price is [redacted] higher than the lowest offer and approximately [redacted] than the government estimate." AR220. On that basis, the CO concluded that the SLA's offered price was fair and reasonable and that award should be made to it. AR3;220.

Award was made to the Kentucky Office for the Blind on February 27, 2007. AR223. On March 6, 2007, the Army held a telephonic debriefing with MCS. AR246. During that debriefing, the CO explained that "the Joint Report is not yet in effect and that it could, therefore, not be used." AR246. The CO also explained that the price reasonableness determination was "based on competition received, on the IGE, and was also supported by GAO case law." AR246.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

On March 9, 2007, MCS filed a protest with the Government Accountability Office ("GAO"). AR247. MCS alleged: (1) that the award to the SLA violated the August 29, 2006 Joint Report to Congress by the Departments of Defense and Education, (2) there was no assignment of price reasonableness, and (3) the RFP required that there be a best value analysis although permitted award to the lowest price technically acceptable offeror, and an award to the SLA was in contravention of the RFP criteria. AR251-54. The agency responded by submitting a contracting officer's report and other relevant documents. See AR313 (contracting officer's statement). During the pendency of the GAO protest, performance of the newly awarded contract was stayed and MCS continued to perform month long bridge contracts.

On June 5, the GAO issued its decision, denying the protest in its entirety. AR315. Specifically, the GAO determined that "the contracting officer correctly concluded that adherence to the Joint Report policy was not mandatory until it had been implemented through the issuance of regulations." AR318. The GAO also determined that MCS' contention that the government estimate is flawed was a "challenge to the estimated requirements set out in the RFP [and] to be timely, had to be raised prior to the time that proposals were due." AR318 (citing 4 C.F.R. § 21.2(a)(1)). The GAO finally concluded that it was permissible for the Army to compare the SLA's proposed price with the prices of other offerors in order to determine whether the price was reasonable. AR318. This protest followed.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

ARGUMENT

I. Jurisdiction And The Standard Of Review

This Court has jurisdiction to entertain bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491 (b) (4). This Court's review of agency procurement decisions is quite limited. The Court evaluates such decisions pursuant to the standards of the Administrative Procedures Act, 5 U.S.C. § 706. Thus, an agency's procurement decisions will not be disturbed unless shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2) (A); Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Interspiro, Inc. v. United States, 72 Fed. Cl. 672, 678 (2006) (citation omitted).

"A motion for judgment on the administrative record is not a true motion for summary judgment." Tech Systems, Inc. v. United States, 50 Fed. Cl. 216, 222 (2001) (citing RCFC 56.1). "[T]he central inquiry on a motion for summary judgment – whether the movant has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes summary judgment – has no bearing on a review of the administrative record [in this case]." Id. The inquiry, instead, is whether MCS can meet its burden of showing that the award decision was arbitrary, capricious, unsupported by substantial evidence in the administrative record, or contrary to law. Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005).

In reviewing the agency's procurement decisions, the Court should recognize that the decision is entitled to a "presumption of regularity," Citizens to Preserve Overton Park, 401 U.S.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

at 415 (citations omitted), and that the Court should not substitute its judgment for that of the agency. Cincom Systems, Inc. v. United States, 37 Fed. Cl. 663, 672 (1997); see also M.W. Kellogg Co. v. United States, 10 Cl. Ct. 17, 23 (1986) (holding that "deference must be afforded to an agency's . . . procurement decisions if they have a rational basis and do not violate applicable law or regulations"). A protester alleging a violation of procurement statutes or regulations faces a heavy burden, and "must show a clear and prejudicial violation of [the] applicable statutes and regulations." Portfolio Disposition Mgmt Group, LLC v. United States, 64 Fed. Cl. 1, 7 (2005) (citations omitted).

The disappointed bidder "bears a heavy burden," and the procurement officer is "entitled to exercise discretion upon a broad range of issues confronting [her]." Impresa, 238 F.3d at 1332 (citations and quotes omitted). "The touchstone is not whether the court would have made a different decision . . . but, rather, whether the [agency] had a rational basis for the decision it did make." Blue & Gold Fleet, LP v. United States, 70 Fed. Cl. 487, 495 (2006). A bid protestor cannot prevail merely by establishing the existence of oversights or errors in the evaluation process. Keco Indus., Inc. v. United States, 203 Ct. Cl. 566, 579 (1974).

Because contracting officials exercise wide discretion in their evaluation of procurement regulations, a bid protestor may prevail only when it is clear that the agency's determinations were irrational and unreasonable. R & W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003). Thus, "when an officer's decision is reasonable a court may not substitute its judgment for that of the agency." Id. Where the agency enjoys this wide discretion, the protester faces a high burden to show that an agency decision lacked a rational

basis. Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1330 (Fed. Cir. 2004); Cincom, 37 Fed. at 672.

## II. The Government Is Entitled To Judgment Upon The Administrative Record Because The CO Properly Applied The Priority Required By The RSA

The Government is entitled to judgment upon the administrative record. The contracting officer's decision to award the contract to the SLA was rational and did not violate any statute or regulation. Judgment in the Government's favor is appropriate because, based upon the administrative record, MCS cannot meet its burden of proof that an award is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law, or violates to prejudicial effect an applicable procurement regulation. Because the CO properly applied the priority of blind vendors required by the RSA when she awarded the contract to the SLA, this Court should affirm the agency's decision and deny the protest.

The Secretary of Education administers the RSA and is authorized to prescribe regulations to effectuate the purposes of the statute. Southfork Sys., Inc. v. United States, 141 F.3d 1124, 1127 (Fed. Cir. 1998). The Secretary is responsible for designating in each state an agency to issue licenses to blind persons for the operation of vending facilities. Id. (citing 20 U.S.C. § 107a(a)(5)). A designated state licensing agency ("SLA") is required to give preference to blind persons who are in need of employment when issuing a license for the operation of a vending facility. Id. (citing 20 U.S.C. § 107a(b)).[2]

[2] The statute defines a "vending facility" as "automatic vending machines, cafeterias, snack bars, cart services, shelters, counters, and such other appropriate auxiliary equipment as the Secretary [of Education] may by regulation prescribe." 20 U.S.C. § 107e(7).

**AGREED UPON REDACTED COPY
MAY BE MADE PUBLIC**

By regulation, qualified blind vendors are to be accorded a priority in the competitive selection of contracts awarding opportunities to operate cafeterias on Federal property. 34 C.F.R. § 395.33(a). Vendors demonstrate the requisite qualification "[i]f the proposal received from the State licensing agency is judged to be within a competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award." 34 C.F.R. § 395.33(b). Consistent with these regulations, the solicitation provided that "a technically acceptable offer from a qualified State Licensing Agency will receive preference in accordance with the Randolph-Sheppard Act." AR83. DOD Directive No. 1125.3, section E2.1.3.1.2, provides that "if the State licensing agency submits a proposal and it is within the competitive range established by the contracting officer, the contract will be awarded to the State licensing agency." See also Commonwealth of Kentucky Educ. Cabinet v. United States, 424 F.3d 1222, 1224 (Fed. Cir. 2005) (same). Accordingly, the agency is required to effect the preference for the SLA if the offer is within the competitive range.

A. The Five Percent Benchmark To Determine Whether A SLA's Offer Is "Fair And Reasonable" Outlined In The Joint Report Does Not Carry The Force Of Law

MCS does not dispute that blind vendors enjoy such statutory priority, but argues that the Army "unlawfully disregarded the Joint Report . . . ." Compl. ¶ 34. Specifically, MCS argues that the CO erred by disregarding the five percent benchmark outlined in the Joint Report. Compl. ¶ 35. The Joint Report recommended that a blind vendor's offered price would be considered "fair and reasonable" if it "did not exceed the offer that represents the best value . . . by more than five percent of that offer, or one million dollars, whichever is less, over all

performance periods required by the solicitation." AR280. Because the Joint Report does not carry the force of law and because five percent benchmark was not ultimately identified as the source selection criteria in the solicitation, the Army's award to the SLA was proper.

Section 848, entitled "Statement of Policy and Report Relating to Contracting with Employers of Persons With Disabilities," merely required the Secretary of Defense, the Secretary of Education and the Chairman of the Committee for Purchase From People Who Are Blind or Severely Disabled to "issue a statement of policy related to the implementation of the Randolph-Sheppard Act (20 U.S.C. 107 et seq.) and the Javits-Wagner-O'Day Act (41 U.S.C. 48) within the Department of Defense and the Department of Education." Pub. L. 109-163 §848(b). It did not direct what such policy would be, how it would be implemented, or when it would be implemented. Section 848(c) anticipated that the joint policy would be submitted to Congress for review along with "findings and recommendations as the Secretaries consider appropriate," thus contemplating that further action was necessary to effect the parties' recommendations. Pub. L. 109-163 § 848(c).

On February 3, 2006, the DoD requested "written comments for consideration by the [interagency] team in developing the policy statement and report to Congress." 71 Fed. Reg. 5819 (Feb. 3, 2006). Specifically, the DoD sought "comments that will assist in identifying appropriate policy solutions for implementation of the [RSA] and [JWOD] as they pertain to both the operation and management of military dining facilities." This public notice makes clear that the DoD sought public input in creating a policy statement to provide to Congress, not to promulgate binding regulations.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Nowhere within Section 848 is there any limitation or directive that would require the contracting officer to apply the stated percentage formula when determining price reasonableness. Instead, the Joint Report itself contemplates further review prior to issuance of formal, binding, regulations. AR280. Whether a policy statement has legal effect "is a function of the agency's intention to bind either itself or regulated parties." Kennecott Utah Copper Corp. v. United States Dep't of Interior, 88 F.3d 1191, 1223 (D.C. Cir.1996) (APA review). In making this determination, the court may look to "the agency's own characterization of its action and to publication or the lack thereof in the Federal Register or the Code of Federal Regulations." Am. Portland Cement Alliance v. EPA, 101 F.3d 772, 776 (D.C. Cir.1996) (APA review). General policy statements are not binding. Telecomms. Research & Action Ctr. v. FCC, 800 F.2d 1181, 1186 (D.C. Cir.1986) (finding document not binding in part because agency characterized it as produced "solely for the purpose of reference and convenience").

The CO's decision not to adopt the Joint Report recommendations as her source selection criteria did not taint the procurement because the Joint Report contents do not regulate or control current procurements. The GAO properly concluded that "until such regulations are issued, the policy is the equivalent of internal agency guidance, which does not establish legal rights and responsibilities such that actions taken contrary to it are subject to objection." AR318.[3]

[3] Decisions from the GAO may be cited be either party as persuasive, albeit non-binding, authority. Federal Mgmt Sys., Inc. v. U.S., 61 Fed. Cl. 364, 367 (2004) (citing AINS, Inc. v. United States, 365 F.3d 1333, 1340 n. 5 (Fed. Cir. 2004)).

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

Even to the extent the Joint Report could be considered proposed regulations, such proposed regulations have no legal force or effect until they become final. Blackfeet Nat'l Bank v. Rubin, 890 F. Supp. 48, 52-54 (D.D.C. 1995) ("[P]roposed regulations do not purport to regulate current conduct by the parties . . . [and] do not have the status of law or require anyone to comply with them in any matter."), aff'd, 67 F.3d 972 (D.C. Cir.1995); Yocum v. United States, 66 Fed. Cl. 579, 590 (Fed. Cl. 2005) (same); LeCroy Research Sys. Corp. v. United States, 751 F.2d 123, 127 (2d. Cir. 1984) ("Proposed regulations are suggestions made for comment; they modify nothing"). Because the contents of the Joint Report are not even proposed regulations, there is no basis to reverse the contract award for the CO's failure to comply with them.[4]

Simply put, the Joint Report is not a mandate to the Army that carries the force of law unless and until the recommendations are implemented into regulation, pursuant to the Administrative Procedures Act's notice-and-comment provisions. For that reason, the five percent benchmark differs from the "non-poaching provision" identified in the Joint Report because Congress has enacted that provision into law in a separate statute. See Pub. L. 109-364 § 856 (Oct. 17, 2006). Accordingly, the five percent benchmark identified in the Joint Report

---

[4] To the extent that MCS argues that the Army has contravented Congress' intent for the parties to promptly implement regulations, Compl. ¶¶ 43; 57, MCS has no cause of action for money damages against the United States for failure to promptly implement regulations. Similarly, this Court should decline MCS' suggestion that "Congress should be invited to step in and weigh in on this." Pl. Mem. at 31.

carried no force of law, contrary to MCS' claim. Compl. ¶¶ 37; 50. Instead, the CO retained discretion to determine whether the SLA's price proposal was fair and reasonable.

DoD memoranda, issued a few days after contract award, also confirm that the policies outlined in the Joint Report were not ready to be implemented. On March 1, 2007, Susan Pollock, Senior Procurement Analyst for DoD sent a notice informing interested parties that "the OSD Office of General Counsel has advised that the joint statement of policy is not effective until it is implemented in regulations in accordance with paragraph 10 of the policy." AR274. On March 16, 2007, the Director of Defense Procurement and Acquisition Policy issued a memorandum addressing the Joint Report. AR261-62. In that memo, the director advised: "the joint policy should not be cited in individual solicitations until it is implemented in complementary regulations by the ED and DoD." AR261. MCS characterizes these memoranda as "post hoc justifications," Compl. ¶ 51, however the two memoranda merely confirm the CO's conclusion that the five percent benchmark outlined in the Joint Report was not binding on this procurement and that individual contracting officers retained discretion to make a "fair and reasonable" determination. Therefore, the agency was required to adhere to the evaluation scheme identified in the solicitation, not other internal Government documents. <u>Mantech Telecomm. and Info. Sys. Corp. v. United States</u>, 49 Fed. Cl. 57, 67 n.15 (2001); <u>see</u> 48 C.F.R. § 15.404-1(d)(3). MCS' "post-hoc" argument is entirely misplaced. The dates of the memoranda are, at best, irrelevant. The significance of the memoranda is that they contain an accurate statement of the legal status of the Joint Report, reflecting the Joint Report's non-effective status at the time of the CO's determination.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

MCS also appears to contend that the Army "unlawfully disregard[ed]. . .Section 848 of the National Defense Authorization Act for Fiscal Year 2006." Compl. ¶ 34. Section 848 requires that DoD and DOE "jointly issue a statement of policy related to the implementation of the [RSA] and the [JWOD] within the Department of Defense and the Department of Education." Pub. L. § 848(b). The public law also requires the parties to submit a report to Congress "describing the joint statement of policy issued under subsection (b), with such findings and recommendations as the Secretaries consider appropriate." Clearly, DoD has complied with these requirements by submitting the Joint Report to Congress on August 29, 2006. To the extent that MCS contends that DoD did not comply with congressional mandate to produce the Joint Report, this Court is not the proper forum for that argument.

Because the Joint Report did not have the effect of law, the CO was not required to use the proposed five percent benchmark as the basis for her "fair and reasonable" price determination in this procurement. Accordingly, no statute or regulation has been violated.

## III. The CO's Price Reasonableness Determination Was Rational And In Accordance With Regulation

Award to the SLA was proper because the CO rationally concluded that the SLA's price was fair and reasonable. The CO is responsible for making a determination that the proposed awardee's price is reasonable. 48 C.F.R. §§ 15.404-1(a)(1). DoD Directive 1125.3, which implements the RSA, provides that "[i]f the State licensing agency submits a proposal and it is within the competitive range established by the contracting officer, the contract will be awarded

to the State licensing agency except [if the agency makes a high level determination that it would have an adverse effect upon the United States]."

Consistent with the terms of the solicitation and regulation, the Army was required to award the contract to the SLA if the SLA provided a technically acceptable proposal and proposed a fair and reasonable price. MCS evidently does not dispute that the SLA provided a technically acceptable proposal, but disagrees with the CO's determination that the SLA proposal provides a fair and reasonable price.

MCS contends that no real price evaluation was performed. Compl. ¶¶ 65;67; Pl. Mem. at 20. However, the solicitation notified potential offerors that "price will not be rated." AR83. This provision means that price is considered, but not rated as are the past performance and experience factors Therefore, the CO was not required to evaluate price. Rather, pursuant to acquisition regulations, the CO was required only to determine price reasonableness. AR84. The terms of the solicitation did not confine the CO to a particular method of determining price reasonableness. Therefore, the CO was free to determine which method she would use to make the price reasonableness determination. 48 C.F.R. § 15.404-1(b)(2) ("The Government may use various price analysis techniques and procedures to ensure a fair and reasonable price.") The CO was not constrained to a five percent "test" or "guideline" in making her determination, contrary to MCS' views. Compl. ¶¶58;60. Given that price reasonableness determination involves the CO's exercise of considerable discretion, this Court should not question the determination unless it lacks a rational basis. SDS Int'l v. United States, 48 Fed. Cl. 742, 759 (2001).

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

A. The CO Rationally Concluded The SLA's Price Was Fair By Comparing It To The Other Offerors' Proposals

The CO determined that the SLA's price was comparable with other offered prices. AR220. This is an acceptable method of price analysis. See 48 C.F.R. § 15-404.1(b)(i). The link between fair pricing and competitive offers is necessary because "competition establishes price reasonableness." First Enterprise v. United States, 61 Fed. Cl. 109, 123 (2004) (quoting 48 C.F.R. § 15.305(a)(1)); see also Matter of Rodgers Travel, Inc., Comp. Gen. No. B-291785, 2003 CPD ¶ 3 (Mar.12, 2003) at n. 1 (stating that the purpose of a price reasonableness determination is to ensure that the prices offered are not higher, as opposed to lower, than warranted). The Kentucky SLA's proposal was the [redacted] of [redacted] offers received. The CO determined that the SLA's proposed offer was [redacted] percent higher than the [redacted]. AR220.[5] The CO explained that "a sufficient number of technically acceptable offers [[redacted]] were received to aid in the price reasonableness determination." AR3. The CO noted a narrow range of variation between those [redacted] offers of [redacted] percent. AR313. MCS does not identify the error in the price reasonableness determination, other than its contention that it does not comply with the policy outlined in the Joint Report.[6]

MCS' other objection appears to be that its offer was lower than the SLA. Compl. ¶¶ 56; 59. However, in the context of a procurement in which a SLA has submitted an offer, the fact

---

[5] MCS does not dispute this mathematical computation.

[6] Contrary to MCS' contention that there is no "contemporaneous narrative demonstrating [price reasonableness] review," Pl. Mem. at 21, the source selection document, AR220, explains the CO's rationale.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

that MCS's proposed costs are lower than that proposed by the SLA does not demonstrate that the SLA's costs are not fair and reasonable. The solicitation put offerors on notice that "application of the [RSA] preference may result in award to other than the lowest priced technically acceptable offeror." AR84. Because of RSA's clear mandate to enhance procurement opportunities for blind vendors by assigning them preference in military mess hall contracts, award to the SLA, even if it was not the lowest offeror, was statutorily permissible.

B. The CO Also Properly Compared The SLA's Price To The Independent Government Estimate In Determining Whether The Price Was "Fair And Reasonable"

Although not required, the CO also determined that the SLA's price was reasonable by comparing it with the Independent Government Estimate ("IGE"). AR220. The IGE establishes the anticipated cost of acquiring the services in the acquisition. Comparison with Government estimates is an established means of determining the reasonableness of a proposed price. 48 C.F.R. § 15.404-1(b)(v); Kinetic Structures Corp. v. United States, 6 Cl. Ct. 387, 395 (1984).

The IGE for the performance period was [redacted] That amount was based upon the Directorate of Logistics' original estimate for eleven dining facilities at [redacted]. AR497. That number was rounded down to [redacted] in the purchase request sent to the CO. AR493. An additional dining facility (building 6944) was added to the contract requirements prior to the issuance of the solicitation, which added [redacted] to the IGE. AR509. Based on this estimate, the CO determined that the KOB's offer of $4,561,429.25 was "approximately [redacted] than the government estimate." AR220.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

As described more fully in the declaration of Deborah Rayburn, the Directorate of Logistics employee responsible for preparing the IGE, the IGE was a reasonable estimate of the anticipated cost of the food services contract and needs of Ft. Campbell. See AR511-12. The IGE was created by reviewing historical data of meals served and days open for the Ft. Campbell food services facilities. An IGE was created for each of the twelve dining facilities at Ft. Campbell that the contract would cover. See AR498-508.

The IGE was based on an estimate that the dining facilities would be open about [redacted] each year. AR497. In the answers to pre-proposal questions submitted, the CO explained that "closures are due primarily to weekend/holiday rotation when headcount usually drops and for major FTX [field training exercises] and/or division deployments." AR489.

The IGE was created by using average meals per day served from the time period [redacted] AR510. The Directorate of Logistics used those years because "it was the most recent full year with no significant deployment of military personnel." AR511 (declaration of D. Rayburn). It was important to use the higher historical data "because of the uncertainty of deployments, estimates are made on the potential that troops will be at Fort Campbell." AR511. The IGE also took into account number of personnel, overhead, G&A, profit, local taxes, and other standard items. See AR511. Accordingly, the CO satisfied the FAR's requirement that the CO determine price reasonableness.

MCS contends that the CO "failed to perform a proper assessment of price reasonableness by using a flawed Government Estimate." Compl. ¶ 68. Specifically, MCS contends that the IGE is "grossly inflated" and alleges that there "may have been a mistake in

computing the IGE." Compl. ¶¶ 68; 71. MCS' general contention is that its own cost estimate results in [redacted] less than the Army's "projected estimated costs." Compl. ¶¶ 78-80. MCS also contends its actual costs for February 2007, during the bridge contract period, were [redacted] less than the Government's estimate. Compl. ¶ 79. However, MCS' current contract does not include full food services, as the newly awarded contract does.

Independent government estimates "represent the agency's best estimate of the most reasonable current price of the products or services being procured." John Cibinic, Jr. & Ralph C. Nash, Jr., FORMATION OF GOV'T CONTRACTS, 1317 (3d ed.1998). Estimates are not expected be completely accurate because they can only anticipate future needs. Therefore, the mere fact that the IGE may be higher than the eventual actual costs to perform the contract does not render the CO's reliance on it arbitrary or irrational. Moreover, the agency provided a rational explanation for why the estimate may be higher than current actual costs–the recognition that currently deployed troops may return to Ft. Campbell. AR511. In preparing for a procurement, the agency must conservatively estimate projected needs to ensure adequate funding.

A price reasonableness analysis ensures that the Government does not pay too much for supplies or services. MCS does not explain how the differential between the IGE and its own estimate is grossly disproportionate or otherwise not trustworthy, other than its belief that the IGE estimate may be higher than eventual actual costs. MCS also does not explain how an inaccurate IGE hurt it, considering that the IGE was not part of the RFP or otherwise made available to offerors. Mere disagreements with the Army's assessments "fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process

and hence arbitrary and capricious." JWK Int'l Corp. v. United States, 52 Fed.Cl. 650, 660 (2002); see also Matter of NVT Technologies, Inc., Comp. Gen. B-256072.2, 94-1 CPD ¶ 297 ("generalized objections to the agency's IGE do not show that it was unreasonably high.")

C. Even If the IGE Was Inaccurate, There Was No Prejudice To MCS Because All Bidders Used The Same Assumptions

Even assuming that the IGE is higher than Ft. Campbell's actual, eventual, needs for the contract term, any error or discrepancy did not prejudice MCS because all bidders used the same assumptions regarding days opened and meals served in arriving at their offered price. Technical Exhibit 2 to the solicitation, entitled "Workload Data," provided all offerors with historical data regarding the number of meals served at each dining facility for the time period between June 1, 2004 through May 31, 2005. AR389-438. [redacted]. AR498-508. Therefore, all offerors used the same historical data to prepare their bids. For an unsuccessful offeror to challenge a contract awarded under policies applied equally to that offeror constitutes an attempt "to use the protest system to obtain an undeserved 'second bite at the apple' by correcting a problem which had no effect whatsoever on [MCS's] chances of winning the contract." Ryan Co. v. United States, 43 Fed. Cl. 646, 658 (1999).

Protesters must do more than "pick lint off of [the] procurement." Andersen Consulting v. United States, 959 F.2d 929, 932 (Fed. Cir. 1992). MCS does not explain how an inaccurate IGE was prejudicial if all parties were using the same historical data to prepare their offers and all [redacted] technically responsive offers, including MCS's offer, were [redacted]. Therefore,

because MCS cannot show that the agency's alleged errors were prejudicial, Portfolio Disposition, 64 Fed. Cl. at 7, this Court should reject this argument.

D. Even Assuming An Inaccurate IGE, Any Error Was Harmless Because The CO Also Compared The SLA's Proposed Price To Other Offerors' Proposed Prices

Even assuming that the IGE was so inaccurate that it should not have been used to determine whether the SLA's proposed price was fair and reasonable, the CO's price reasonableness analysis still stands. The CO concluded that "competition alone was enough to make a price reasonableness determination." AR313. Thus, rather than "destroying the credibility of the alleged price reasonableness," Pl. Mem. at 22, any error in the IGE was harmless error. In her statement to the GAO, the CO affirmed that "even if the IGE were determined to be flawed and required correction . . . I would still find that the proposed price of the Kentucky SLA is reasonable." AR313. Therefore, any error did not prejudice MCS. See Dismas Charities, Inc. v. United States, 61 Fed. Cl. 191, 208 (2004) (holding that CO's failure to use awardee's actual prices in evaluating price reasonableness was harmless error where the error had no effect on the validity of the price analysis.) The GAO correctly concluded that "the comparison of offerors' prices to one another clearly furnished the contracting officer with an additional valid basis for finding the awardee's price reasonable." AR319.[7]

---

[7] It is absurd that MCS appears to suggest, Compl. ¶ 83, that this Court permit it to create a new record by MCS reexamining the IGE to produce material that was not before the CO and should not be considered by this Court. 5 U.S.C. § 706; Advanced Data Concepts, Inc. v. United States, 43 Fed. Cl. 410, 416 (1999), aff'd 216 F.3d 1054 (Fed. Cir. 2000) (holding court confines its review to record before agency).

Finally, MCS contends that, in light of the RSA, "it never stood a chance of being fairly evaluated and receiving the contract." Compl. ¶ 63. However, this contention is a dispute with the RSA itself, an issue over which this Court does not possess jurisdiction. Automated Comm. Sys., Inc. v. United States, 49 Fed. Cl. 570, 575 (2001) (relying on Southfork).

If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion[.]" Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989). Because the CO provided a reasonable basis for concluding that the SLA offered a fair and reasonable price, this Court should uphold the contracting officer's determination and award to the SLA.

IV. MCS Is Not Entitled To Injunctive Relief

Because injunctive relief is so drastic in nature, MCS must demonstrate its right to injunctive relief by clear and convincing evidence. Bean Dredging Corp. v. United States, 22 Cl. Ct. 519, 522 (1991). To accord "extraordinary relief," the Court applies "exacting standards." Lermer Germany GmbH v. Lermer Corp., 94 F.3d 1575, 1577 (Fed. Cir. 1996). A plaintiff that has not actually succeeded on the merits of its claim cannot prevail on its motion for injunctive relief. National Steel Car, Ltd. v. Canadian Pacific Railway, Ltd., 357 F.3d 1319, 1325 (Fed. Cir. 2004). As demonstrated above, the CO rationally concluded that the SLA's offered price was fair and reasonable and, on that basis, properly awarded it the contract. Accordingly, MCS' request for injunctive relief should be denied for failure to succeed on the merits.

In deciding whether to issue a permanent injunction the court must consider whether: (1) the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. See Amoco Prod. Co. v. Vill. of Gambell, AK, 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); United Int'l Investigative Svcs., Inc. v United States, 41 Fed. Cl. 312, 323 (1998) (citing cases). Failure to meet the criteria of any one factor may require denial of the request for a preliminary injunction. "No one factor, taken individually, is necessarily dispositive." Blue & Gold, 70 Fed. Cl. at 494.

The United States Court of Appeals for the Federal Circuit has held that the court is not required to set aside an arbitrary, capricious, or otherwise unlawful contract award. See PGBA, LLC v. United States, 389 F.3d 1219, 1226 (Fed. Cir.2004) ("We thus hold that, in a bid protest action, [28 U.S.C. § ] 1491(b)(4) does not automatically require a court to set aside an arbitrary, capricious, or otherwise unlawful contract award.").

The party seeking preliminary injunctive relief bears the extremely heavy burden of demonstrating its entitlement to this extraordinary relief by clear and convincing evidence. E.g., Cincom, 37 Fed. Cl. at 268 (citing Baird Corp. v. United States, 1 Cl. Ct. 662, 664 (1983)).

### A. MCS Has Failed To Demonstrate, Through Clear And Convincing Evidence, That It Will Suffer Irreparable Harm If This Court Does Not Grant Its Motion For Injunctive Relief

MCS faces a "heavy burden" in requesting injunctive relief. IMS Svcs. Inc. v. United States, 33 Fed. Cl. 167, 177 (1995). The equitable jurisdiction of the Court may be invoked only

in "extraordinary circumstances," Kinetic Structures, 6 Cl. Ct. at 393, and injunctive relief is considered a "drastic measure." IMS, 33 Fed. Cl. at 177-78. Thus, when such relief is requested, the Court should exercise "great caution." Id. at 180.

MCS argues that if injunctive relief is not granted in its favor, that it will suffer "immediate and irreparable injury" in the form of lost profits. Pl. Mem. at 31. This type of economic loss alone does not rise to the level of irreparable injury. See Sierra Mil. Health Servs. v. United States, 58 Fed. Cl. 573, 582 (2003) (irreparable harm is not shown where "most of plaintiff's alleged harms result not from a lack of opportunity to compete for the contract, but from loss of the actual contract"); but see Hospital Klean of Texas, Inc. v. United States, 65 Fed. Cl. 618, 624 (2005) (holding that lost profits constituted irreparable harm).

B. MCS Has Not Demonstrated, Through Clear And Convincing Evidence, That The Harm To The Government From Granting Injunctive Relief Would Be Less Than The Harm To MCS If The Court Denied MCS's Motion

If the Court were to grant injunctive relief, and order the SLA not to commence work on July, 1, 2007, the harm to the Government would be severe. If the CO were ordered to re-evaluate bids or revise the IGE, there would be delay that would cause mission failure to Ft. Campbell, KY. In other words, there would not be staff to prepare and serve meals. Currently, the food preparation has been performed by civilian temporary hires, whose terms expire on June 30. MCS' suggestion that it perform all services is generous, but ignores the requirement that there be competition for the work.

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

C. MCS Has Not Demonstrated, Through Clear And Convincing Evidence, That It Is In The Public Interest To Grant MCS's Motion For Injunctive Relief

As MCS observed in its motion for a preliminary injunction, the public's interest is served when the integrity of the procurement system is maintained. Pl. Mot. at 33 (citing Seattle Security Svcs. v. United States, 45 Fed. Cl. 560, 571 (2000)). However, as demonstrated above, MCS has failed to show that the integrity of the procurement system has been compromised. Generally, the public interest is served by ensuring that the Government procurement process is fair. Sierra, 58 Fed. Cl. at 584. In this case, the Army must ensure that the process is fair and lawful by applying the priority to blind vendors that Congress has established. Moreover, the agency should be able to conduct procurements expeditiously and with minimal judicial encroachment upon agency discretion. Cincom, 37 Fed. at 269; see generally Bannum, 404 F.3d at 1356 (the trial court must "give due regard to the need for expeditious resolution of the action") (quotation omitted).

Therefore, MCS has not demonstrated, through clear and convincing evidence, that it is in the public interest to grant its motion for a preliminary injunction.

**CONCLUSION**

For the foregoing reasons, the Court should enter judgment in favor of the United States and dismiss the complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

JEANNE E. DAVIDSON
Director

S/Donald E. Kinner
DONALD E. KINNER
Assistant Director

S/Tara K. Hogan
TARA K. HOGAN
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Attn: Classification Unit, 8th fl.
1100 L Street, N.W.
Washington, D.C. 20530
Tel. (202) 616-2228
Fax. (202) 305-7643

OF COUNSEL:
LTC FRANK MARCH
CAPT JOSHUA DREWITZ
Contract & Fiscal Law Division
Office of the Judge Advocate General
Department of the Army
901 N. Stuart St., Suite 500
Arlington, VA 22203

June 28, 2007

Attorneys for Defendant

**AGREED UPON REDACTED COPY**
**MAY BE MADE PUBLIC**

CERTIFICATE OF ELECTRONIC FILING

I hereby certify that on this 28th day of June, 2007, a copy of the foregoing agreed-upon redacted copy of "DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/Tara K. Hogan