# In the United States Court of Federal Claims

**No. 07-377C**
**(Filed: July 13, 2007)****

****OPINION ORIGINALLY FILED UNDER SEAL ON JUNE 29, 2007**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **MOORE'S CAFETERIA SERVICES, d/b/a MCS MANAGEMENT,** | * | |
| | * | **Bid Protest; Waiver of Challenges to Terms of Solicitation; Independent Government Estimate; Price Reasonableness; Proof of Prejudice.** |
| **Plaintiff,** | * | |
| **v.** | * | |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * * * * * * | | |

*Sam Z. Gdanski,* Suffern, NY, for plaintiff. *Scott H. Gdanski*, of counsel.

*Tara K. Hogan,* U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler, Assistant Attorney General* and *Director Jeanne E. Davidson,* for defendant. *LTC Frank March* and *Capt Joshua Drewitz*, Office of the Judge Advocate General, Department of the Army, of counsel.

**O P I N I O N**

---

**FIRESTONE**, *Judge*.

This post-award bid protest action comes before the court on the government's motion for judgment upon the Administrative Record pursuant to Rule 52.1 of the Rules

of the United States Court of Federal Claims ("RCFC") and the plaintiff's motion for a temporary restraining order and a preliminary injunction. The plaintiff, Moore's Cafeteria Services, d/b/a MCS Management ("plaintiff" or "MCS"), the incumbent contractor since August 1, 2004, challenges the Department of the Army's ("Army") award of a one-year (April 1, 2007 through March 31, 2008) food services contract at Fort Campbell, Kentucky, to the Kentucky Office for the Blind, which is a state licensing agency ("SLA") for the state of Kentucky. The Army awarded the contract to the SLA on February 27, 2007 for $4,561,429.25.

MCS contends that the Army's award to the SLA violated policies set forth in a 2006 Joint Report to Congress regarding priority afforded to SLAs under the Randolph-Sheppard Act ("RSA"), 20 U.S.C. §§ 107-107f (2000), in military dining procurements. MCS also contends that the Contracting Officer ("CO") did not adequately perform a price reasonableness analysis and used a flawed Independent Government Estimate ("IGE") in awarding the contract. The government contends that the CO's decision to award the contract to the SLA was appropriate, and accordingly seeks judgment upon the Administrative Record.

For the reasons set forth below, the government's motion for judgment upon the Administrative Record is **GRANTED**. The plaintiff's motion for a temporary restraining order and a preliminary injunction is **DENIED**.

## BACKGROUND

### I. Background Facts

#### A. The Joint Report to Congress

The plaintiff's primary argument centers around a Joint Report to Congress ("Joint Report") submitted on August 29, 2006 by the Department of Defense ("DoD"), the Department of Education ("DoE"), and the Committee for Purchase from People Who are Blind or Severely Disabled. These three parties were required, by section 848 of the National Defense Authorization Act ("NDAA") of Fiscal Year 2006, Pub. L. 109-163, to submit to Congress a Joint Report setting forth policy regarding the application of the Javits-Wagner-O'Day Act[1] ("JWOD"), 41 U.S.C. §§ 46-48c (2000), and the RSA[2] to military dining contract procurements. In the Joint Report, the parties set forth the following method for ensuring that RSA priority would be afforded appropriately in military dining procurements:

---

[1]The Javits-Wagner-O'Day Act established the Committee for Purchase from People who are Blind or Severely Disabled, which is required under the JWOD to create a procurement list, to be published in the Federal Register, of the commodities produced by and the services provided by any qualified nonprofit agency for the blind or other severely handicapped individuals. 41 U.S.C. § 47.

[2]The Randolph-Sheppard Act states that "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property." 20 U.S.C. § 107(a). The RSA also requires that, in "authorizing the operation of vending facilities on Federal property," priority be given "to blind persons licensed by a State agency." 20 U.S.C. § 107(b). The procedures for licensing a State agency under the RSA are set forth in 20 U.S.C. § 107b.

> Defense Department contracts for the operation of a military dining facility must be awarded as the result of full and open competition. . . . When competing such contracts, contracting officers shall afford State licensing agencies a priority under the [RSA] when (1) the State licensing agency has demonstrated that it can provide such operation at a fair and reasonable price, with food of high quality comparable to that available from other providers of cafeteria services and comparable to the quality and price of food currently provided to military members; and (2) the State licensing agency's final proposal revision, or initial proposal if award is made without discussions, is among the highly ranked final proposal revisions with a reasonable chance of being selected for award. . . . The term "fair and reasonable price" means that the State licensing agency's final proposal revision does not exceed the offer that represents the best value (as determined by the contracting officer after applying its source selection criteria contained in the solicitation) by more than five percent of that offer, or one million dollars, whichever is less, over all performance periods required by the solicitation.

Administrative Record ("AR") 280 (emphasis added). The Joint Report required that the parties "promptly implement complementary regulations reflecting the joint policy herein." AR280.

On March 1, 2007, LTC Karl W. Kuhn, Regional Counsel to the U.S. Army Contracting Agency, distributed an e-mail from Susan W. Pollock, a Senior Procurement Analyst within the Office of the Under Secretary of Defense for Acquisition, Technology, and Logistics ("OSD-ATL"), concerning the implementation of the policies set forth in the Joint Report, which stated that

> [t]he OSD Office of General Counsel has advised that the joint statement of policy is not effective until it is implemented in regulations in accordance with paragraph 10 of the policy. . . . please provide notification to the field . . . that they should not be citing the joint policy statement in their solicitations.

AR271-272. In addition, Mr. Kuhn's e-mail stated that

> as a KO [contracting officer] exercises their independent judgment on these issues before regulatory changes are made, a 5% calculation may be a good benchmark for the KO to use in deciding whether the SLA has provided a competitive proposal. . . . Accordingly, the KO's fair and reasonable price analysis may use 5% or some reasonable % as a benchmark in comparing the SLA's price to other vendors.

AR270.

**B. The Procurement**

The Army Contracting Agency, Southern Region, Fort Knox Directorate of Contracting, issued solicitation number W9124D-07-R-0012 on January 23, 2007. AR12-47. The solicitation sought proposals for the provision of food services at Fort Campbell, Kentucky, for a one-year period beginning April 1, 2007. AR1. The solicitation was issued as a commercial acquisition, under Federal Acquisition Regulation ("FAR") parts 12 and 15. AR1. The solicitation was a best value procurement and indicated that proposals would be evaluated using lowest priced technically acceptable award criteria, based on past performance and experience. The solicitation stated that price would not be rated.[3] AR41. The solicitation also indicated that it would be subject to the requirements of the RSA, so that

> [a] technically acceptable offer from a qualified State Licensing Agency will receive preference in accordance with the Joint Report to Congress, dated August 29, 2006. This notice is not designed to discourage competition from HUB Zone certified small businesses not eligible for the preference . . . . Application of this preference may result in award to other than the lowest priced technically acceptable offeror.

---

[3]During MCS's post-award debriefing, the CO stated that the statement "price will not be rated" indicated that "unlike past performance information and experience, price does not receive any type of rating . . . it is evaluated for reasonableness." AR246.

AR44-45 (emphasis added).

On January 29, 2007, the CO received an inquiry from the Director of the Tennessee Services for the Blind and Visually Impaired regarding the propriety of the reference to the Joint Report in the solicitation. AR48. The inquiry stated that "to the best of my knowledge there is no directive to convert [the Joint Report] into law." AR48. After considering this inquiry, and after further research, the CO amended the solicitation to remove the reference to the Joint Report. AR2. Amendment 001 to the solicitation, issued on February 7, 2007, reflected the following changes to the language quoted supra:

> A technically acceptable offer from a qualified State Licensing Agency will receive preference in accordance with the Randolph-Sheppard Act. There have been conversations between the contracting office at Fort Knox and a qualified State Licensing Agency in the State of Kentucky regarding interest in providing the services identified in this solicitation. This notice is not designed to discourage competition from HUB Zone certified small businesses not eligible for the preference. . . . Application of this preference may result in award to other than the lowest priced technically acceptable offeror.

AR83-84 (emphasis added). MCS did not object to this Amendment at the time.

The CO received five proposals on February 21, 2007. One proposal, received from the State of Tennessee Department of Rehabilitation, was considered non-responsive because the State of Tennessee is not a qualified State Licensing Agency for Kentucky, and was accordingly not evaluated. AR219. A second proposal, from ******, was determined to be technically unacceptable. AR220. The remaining three proposals (from ******, MCS, and the Kentucky Office for the Blind) were all considered technically acceptable and determined to have a low performance risk. Price thus became

the determining factor in the award. AR220. ****** proposed a price of $ ******; MCS proposed a price of $ ******; and the Kentucky Office for the Blind, the SLA, proposed a price of $4,561,429.25. The Independent Government Estimate ("IGE") was $ ******. AR220. The CO stated that she determined the price proposed by the Kentucky Office for the Blind to be reasonable after making a comparison to pricing proposed in the other technically acceptable offers and to the IGE, finding that "the awardee's price is less than ****** higher than the lowest offer and approximately ****** lower than the government estimate." AR220. The CO also stated that "price was not rated. . . [c]ompetition and government estimate were used in determining fair and reasonable price." AR221. On February 27, 2007, the Army awarded the contract to the Kentucky Office for the Blind for $4,561,429.25 in accordance with the RSA. AR223.

**C. The Post-Award Protest With the Government Accountability Office**

Following the award to the SLA, MCS requested a debriefing, which was held by the Army on March 6, 2007. AR246. During the debriefing, the CO explained that the Joint Report was not used during the selection because it was "not yet in effect and that it could, therefore, not be used." AR246. On March 9, 2007, MCS filed a bid protest with the Government Accountability Office ("GAO"), alleging three grounds for protest: (1) the award violated Section 848 of the 2006 NDAA by not employing the five percent test set forth in the Joint Report for determining price reasonableness; (2) the Army did not adequately assess the price reasonableness of the proposals; and (3) the solicitation

required a best value analysis, which would have prohibited award to the SLA. AR253-254. In the CO's statement in response to MCS's protest to the GAO, the CO indicated that "[c]ompetition alone was enough to make a price reasonableness determination." AR313. The CO also stated that "if the IGE were determined to be flawed . . . I would still find that the proposed price of the Kentucky SLA is reasonable. . . . [A]dequate competition would have resulted in my determination that the price proposed by the SLA is reasonable." AR313. While the GAO protest was ongoing, performance of the contract by the SLA was stayed, and MCS continued to perform through a series of month long bridge contracts.

On June 5, 2007, the GAO issued its decision, finding that "the contracting officer correctly concluded that adherence to the policy [of the Joint Report] was not mandatory until it had been implemented through the issuance of regulations, which has not yet occurred. . . . until such regulations are issued, the policy is the equivalent of internal agency guidance." AR317-318. The GAO also held that MCS's challenge to the IGE was untimely because it was "in essence a challenge to the estimated requirements set out in the RFP; to be timely, it had to be raised prior to the time that proposals were due." AR318. Finally, the GAO found that, "[g]iven the price offered by the [SLA], while higher than the protester's, was lower than the price of the third technically acceptable offeror, the comparison of offerors' prices to one another clearly furnished the contracting officer with an additional valid basis for finding the awardee's price reasonable." AR319.

Performance of the newly awarded contract by the SLA is scheduled to begin on July 1, 2007.

## II. Present Litigation

On June 15, 2007, MCS filed a bid protest action in this court, including a motion for a temporary restraining order and a preliminary injunction. Based on a schedule to which both parties agreed, the Administrative Record was filed on June 20, 2007 and the government filed a motion for judgment upon the Administrative Record on June 22, 2007. The plaintiff was given until June 26, 2007 to respond to the government's motion. The court heard oral argument on June 28, 2007.

# DISCUSSION

## I. Standard of Review

This court has jurisdiction, pursuant to 28 U.S.C. § 1491(b) (2000), "to render judgment on an action by an interested party objecting to a . . . proposed award or award of a contract." 28 U.S.C. § 1491(b)(1). The court must review the contracting agency's decision pursuant to the standards set forth in the Administrative Procedures Act, 5 U.S.C. §§ 701-706 (2000), which requires a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). See also, Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)).

The court "may not substitute its judgment for that of the agency" if the agency's decision is reasonable. R&W Flammann GmbH v. United States, 339 F.3d 1320, 1322 (Fed. Cir. 2003). However, the court may set aside an award if "the procurement official's decision lacked a rational basis; or . . . the procurement procedure involved a violation of regulation or procedure." Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001). An agency's decision should be set aside if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S. ___, Slip. Op. at 10-11 (June 25, 2007) (quoting Motor Vehicle Mfrs. Ass'n. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983)).

## II. The Joint Report to Congress

### A. MCS's Challenge Regarding the CO's Decision to Amend the Solicitation to Remove Reference to the Joint Report Is Untimely.

The government contends that MCS's challenge regarding the use of the Joint Report is untimely, arguing that MCS effectively waived its right to challenge the CO's decision to not use the five percent benchmark set forth in the Joint Report by not objecting to the terms of the solicitation during the bidding process. The government argues that MCS was put on notice, through Amendment 001 to the solicitation, that the

CO would not evaluate the proposals in accordance with the Joint Report, but instead would evaluate the proposals in accordance with the RSA. The government asserts that because MCS did not object to the Amendment at the time it was made, it may not do so now. In support of its contention, the government relies on Blue & Gold Fleet, LP v. United States, Fed. Cir. No. 2006-5064 (June 26, 2007), in which the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." Slip. Op. at 6. At oral argument, the plaintiff attempted to factually distinguish Blue & Gold from the case sub judice, but recognized that the factual distinctions did not affect the ultimate holding in Blue & Gold upon which the government relies.

The court agrees with the government that the plaintiff had the opportunity to object to the terms of the solicitation during the bidding process, and in not doing so, waived its right to do so before this court. The solicitation was amended on February 7, 2007 to remove any reference to the Joint Report from the selection criteria. Once the amendment was issued, MCS had the opportunity to object to the change by the CO and to argue that the CO was legally required to consider the Joint Report in making the award. However, MCS made no objection to the Amendment at that time. Accordingly, MCS "waive[d] its ability to raise the same objection subsequently" before this court. Blue & Gold, Slip. Op. at 6.

**B. The Joint Report to Congress Is Not Legally Binding.**

The holding in Blue & Gold notwithstanding, MCS contends that the Army was required to adhere to the limits set forth in the Joint Report, arguing that because the three parties contributing to the Joint Report were directed by statute to issue the Joint Report, failure to immediately implement the policies set forth in the Joint Report constitutes a violation of a Congressional mandate. To support its contention, MCS relies on two cases from this court which, it argues, support the proposition that the Joint Report is legally binding. See Y.S.K. Constr. Co., Inc. v. United States, 30 Fed. Cl. 449 (1994); Lin v. United States, 3 Cl. Ct. 213 (1983). In Lin, the plaintiff, a naval reserve officer, sought payment he was allegedly due under a variable incentive pay contract that was governed by both statute and by a DoD directive. The court relied upon both statute and the directive in evaluating the plaintiff's claim. MCS contends that the Joint Report at issue should be treated similarly to the directive in Lin, and should thus be considered by the court in evaluating the Army's award. MCS's reliance on Lin, however, is misplaced. In Lin, neither party contended that the directive "should not be accorded the force and effect of law," and, accordingly, the court never reached the issue of whether the directive could be considered binding. 3 Cl. Ct. at 214. The ultimate holding in Lin, regarding the pay to which the plaintiff was entitled, is irrelevant to the case sub judice.

In Y.S.K., the court was faced with determining whether the DoD or the Small Business Administration ("SBA") was responsible for enacting regulations to determine

Small Disadvantaged Business ("SDB") eligibility. The SBA did not make a determination regarding which businesses fit into the statutory SDB classification, as required by Congress, so DoD developed its own policy statement to define SDB status. 30 Fed. Cl. at 456. The court determined that the DoD did not have the power to define eligibility, because that power was solely reserved for the SBA. 30 Fed. Cl. at 457. MCS contends that, in this case, DoD erred in waiting for DoE to enact regulations implementing the Joint Report, because DoD, as well as DoE, was required by Congress under the NDAA to enact implementing regulations. MCS's argument is unfounded. Y.S.K. dealt with a dispute regarding an agency's responsibility to develop regulations, and the holding in Y.S.K., which did not in any instance consider the legal effect of a DoD policy statement, is entirely irrelevant to MCS's argument before this court that the Joint Report is legally binding on the Army.

The government contends that the Joint Report does not carry the force of law, and that the guidelines set forth in the Joint Report will not be binding until formal regulations have been issued by DoE and DoD. The government contends that a policy statement only has a legal effect if it is "the agency's intention to bind either itself or regulated parties." Kennecott Utah Copper Corp. v. United States Dept. of Interior, 88 F.3d 1191, 1223 (D.C. Cir. 1996). The government further argues that even if the Joint Report could be treated as proposed regulations, such regulations would not be binding until being finalized. See Yocum v. United States, 66 Fed. Cl. 579, 590 (2005) ("[I]n general,

proposed regulations have no legal force or effect until they become final.”).

The court agrees with the government. Because no regulations have been implemented to give effect to the policies set forth in the Joint Report, and because DoD has clarified that the Joint Report would not be effective until implemented through regulations, the Joint Report was not binding on the Army in awarding the contract. The cases cited by MCS do not indicate otherwise.

## III. The CO’s Price Reasonableness Determination Was Rational.

### A. The CO’s Reliance On Other Offerors’ Proposals to Determine Price Reasonableness Was Appropriate.

The plaintiff contends that the CO did not perform a proper price reasonableness analysis in awarding the contract because the CO primarily relied upon comparisons of the SLA’s proposal to other offerors’ proposals in determining reasonableness. The plaintiff argues that the CO did not perform a thoroughly reasoned analysis and that simply comparing offerors’ proposals to one another is insufficient and irrational. In particular, MCS contends that, given the guidelines distributed via e-mail by the OSD-ATL and DoD on March 1, 2007, including the statement that “a 5% calculation may be a good benchmark for the [CO] to use in deciding whether the SLA has provided a competitive proposal,” AR270, the CO’s determination that a ****** percent variation indicated price reasonableness was not rational.

The government contends that the CO did perform a proper price reasonableness analysis and that the CO’s reasonableness determination was rational and was made in

accordance with the appropriate regulations. The government asserts that, under the terms of the solicitation, which notified potential offerors that price would not be rated, the CO was not required to evaluate price, but was only required to determine price reasonableness. The government argues that the CO was free to employ "various price analysis techniques and procedures to ensure a fair and reasonable price," 48 C.F.R. § 15.404-1(b)(2), and submits that, absent a clear indication that the determination lacks a rational basis, the court should not question the CO's decision. See SDS Int'l v. United States, 48 Fed. Cl. 742, 759 (2001). Furthermore, the government contends that, under 48 C.F.R. § 15.403-1(c)(1), adequate price competition exists when "[t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement," and that, accordingly, the CO's decision to compare three different offers to assess reasonableness was appropriate.

The court agrees that the CO acted rationally in making the price reasonableness determination. The CO considered three technically acceptable offers that varied by only ****** percent, and determined that the SLA's offer was less than ****** percent higher than MCS's offer. The CO concluded that, because of the narrow range of variation between the three offers, the SLA's offer was fair and was comparable to other offered prices. While MCS is correct that the March 1, 2007 email indicated that a five percent calculation could be a valid benchmark for a CO to use in determining reasonableness, the email also stated that "the [CO]'s fair and reasonable price analysis may use 5% or

some reasonable % as a benchmark in comparing the SLA's price to other vendors." AR270 (emphasis added). Under 48 C.F.R. § 15.404-1(a), the CO is "responsible for evaluating the reasonableness of the offered prices," and is afforded flexibility in determining the "level of detail of the analysis required." In a bid protest case, the court may only overturn an award if the CO's evaluation lacked a rational basis or violated a regulation or procedure. Impresa Construzioni, 238 F.3d at 1332; see also JWK Int'l Corp. v. United States, 49 Fed. Cl. 371, 393 (2001) ("[T]he analysis must reflect that the agency took into account the information available and did not make irrational assumptions or critical miscalculations."); Labat-Anderson v. United States, 42 Fed. Cl. 806, 846 (1999) ("[C]ontracting officers are vested with wide discretion with regard to the evaluation of bids."). "If the court finds a reasonable basis for the agency's action, it should stay its hand . . . ." Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989). Here, the CO has sufficiently demonstrated a rational basis for determining that the SLA's proposal was reasonable, and accordingly, the court upholds the CO's determination.

**B. MCS's Challenges to the IGE Do Not Demonstrate Prejudice.**

To prevail in a bid protest, the plaintiff must demonstrate both that the government acted without a rational basis in awarding the contract, Impresa Construzioni, 238 F.3d at 1332, and that errors in the procurement process significantly prejudiced the plaintiff. Bannum, Inc. v. United States, 404 F.3d 1346, 1353 (Fed. Cir. 2005). "To establish

'significant prejudice' [the plaintiff] must show that there was a 'substantial chance' it would have received the contract award but for errors [in the procurement process]." Id. (quoting Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)). See also, Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999); DynCorp Int'l LLC v. United States, 76 Fed. Cl. 528, 537 (2007) ("If a protestor can show that, but for the procurement error of the agency, there was a substantial chance it would have won the contract award, prejudice has been established.").

The plaintiff contends that the award to the SLA should be set aside because the CO's price reasonableness evaluation was flawed due to its reliance on a flawed and inflated IGE. Specifically, MCS argues that the projections of operational days and meal counts on which the IGE was based are substantially higher than actual, historical data and are unsubstantiated by the data contained in the Administrative Record. MCS therefore contends that the CO's reliance on the IGE was unreasonable. In support of this contention, the plaintiff cites Nutech Laundry & Textile, Inc. v. United States, 56 Fed. Cl. 588 (2003). In Nutech, the court, in a pre-award bid protest, determined that the CO's decision to withdraw an RFP was neither transparent nor well-supported, and that the CO's reliance on an unsubstantiated IGE was not rational. Id. at 595. The court therefore remanded the case to the contracting agency and ordered the agency to develop a new IGE. Id. MCS asserts that, as in Nutech, because the CO relied on the IGE in part to

determine price reasonableness, a thorough inquiry into the validity of the IGE in this case is warranted.

The government contends that the IGE was a reasonable estimate of the anticipated costs of a food services contract at Fort Campbell as required by the solicitation, arguing that an IGE is not required to be entirely accurate, and that the data used to create the IGE was data from the most recent full year without a significant deployment of military personnel. The government contends that the use of the higher data was necessary to account for the possibility that the majority of troops would be at Fort Campbell, and not deployed, throughout the year. Deborah Rayburn, the CO who created the IGE, stated that she used data from the period of June 1, 2004 through May 31, 2005 for the reasons stated above. AR511. Ms. Rayburn also explained that other data used to create the IGE, including wage rates, fringe benefit rates, and profit and general & administrative rates, were all standard rates established either by the Department of Labor or by the Army. AR511. The government asserts that Ms. Rayburn's explanation for the possibility that the IGE could be higher than the actual costs to perform the contract is completely rational. Therefore, the government contends that the CO's reliance on the IGE to evaluate price reasonableness was appropriate.

The government argues in the alternative that, even if the IGE was inaccurate, MCS was not prejudiced by the CO's use of the IGE and that any error committed by the CO was harmless. The government relies on the statement made by the CO in response to

MCS's protest to the GAO that even "if the IGE were determined to be flawed . . . I would still find that the proposed price of the Kentucky SLA is reasonable. . . . [A]dequate competition would have resulted in my determination that the price proposed by the SLA is reasonable." AR313. The government therefore contends that, even if the CO's reliance on the IGE was in error, because the IGE was flawed, MCS suffered no prejudice because price reasonableness determination based solely on a comparison to other offerors' proposals was sufficient to conclude that the SLA's proposal was reasonable.

The court concludes that regardless of whether the IGE is flawed, MCS has not demonstrated that it was prejudiced by the government's use of the IGE in the evaluation process. Where, as here, price reasonableness was established through competition, particularly because the three bids considered by the CO were within an ****** percent range of one another, comparison to the IGE was not necessary to justify the CO's decision. As set forth in 48 C.F.R. § 15.404-1(b)(2), "adequate price competition establishes price reasonableness." Price competition is a preferred technique of price analysis. 48 C.F.R. § 15.404-1(b)(3). The CO need not perform any technique of price analysis other than price competition unless the CO "determines that information on competitive proposed prices . . . is not available or is insufficient to determine that the price is fair and reasonable." Id.

Accordingly, MCS's reliance on this court's holding in Nutech is inapposite. In Nutech, the CO's decision, which was solely based on a comparison between the

protestor's proposal and the IGE, lacked transparency, and the Administrative Record contained no data upon which the court could rely to evaluate the IGE. 56 Fed. Cl. at 595. The CO's decision in this case does not suffer from the same lack of transparency as that in Nutech. Most importantly, the IGE was not the CO's sole basis for making a price reasonableness determination. Instead, the CO primarily relied upon a comparison of the SLA's offer to two other technically acceptable offers, and determined that the SLA's offer was reasonable. Indeed, the CO noted that she would "still find that the proposed price of the Kentucky SLA is reasonable," based on a comparison to the other bids received, even if the IGE were determined to be flawed. AR313. Accordingly, the plaintiff's arguments challenging the IGE are not sufficient to demonstrate prejudice to the plaintiff in the bidding process and therefore do not form a basis for setting aside the procurement decision.[4]

## CONCLUSION

For all of the foregoing reasons, the plaintiff's motion for a temporary restraining order and a preliminary injunction is **DENIED**.[5] The government's motion for judgment

---

[4]MCS set forth numerous detailed arguments about the complexities of the IGE, including: challenges to the data included in Technical Exhibit 2; a supplemental declaration of Daniel V. Moore, President of MCS; and a table comparing the data relied upon for the IGE to actual data compiled by MCS. Because the court has determined that, even if the IGE was flawed, MCS did not suffer any resulting prejudice, a detailed evaluation of these arguments is not necessary to the resolution of this case. For the same reasons, the plaintiff's June 15, 2007 Motion to Supplement the Record to further explore the IGE is **DENIED**.

[5]Because the court has determined that the government is entitled to judgment upon the Administrative Record, the court need not reach the plaintiff's arguments regarding its entitlement to injunctive relief.

upon the Administrative Record is **GRANTED**. Each party is to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge